FILED

2004 Dec-21  PM 03:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | } | |
| | } | |
| | } | |
| v. | } | CASE NO. CR 04-B-0176-S |
| | } | |
| DANIEL LAFITTE DUMONDE, | } | |
| | } | |
| Defendant. | } | |

### MEMORANDUM OPINION

On September 13, 2004, defendant went to trial on a one-count indictment charging defendant with violating 18 U.S.C. §§ 513(a) and 2.  Five days before the date set for trial, defendant moved the court to waive his right to a jury trial and to have the court decide his case.  Defendant told the court that the decision to request a nonjury trial emanated from the defendant, not his standby counsel. The court pointed out to defendant that, in a jury case, the government had to convince 12 people that he was guilty beyond a reasonable doubt; however, in a nonjury case, the government only had to convince one person, the judge.  The court required defendant to consider his request overnight.  On his return to court, defendant reasserted his request for a nonjury trial.  The government consented to a trial by the court.  Thus, the case was tried to the court as fact-finder.

"In a case tried without a jury, the court must find the defendant guilty or not guilty.  If a party requests before the finding of guilty or not guilty, the court must state its specific findings of fact in open court or in a written decision or opinion."  Fed. R. Crim. P. 23(c).  Before rendering its decision the court asked the parties whether they

wanted the court to state its findings of fact.  Defendant requested that the court state its

findings.  The court made some brief statements on the record at the time it rendered its

decision.  However, the court informed the parties at the time that a Memorandum

Opinion would be entered that would set out in more detail the court's findings of fact.

## PRINCIPLES OF LAW

The same principles of law apply in a non-jury criminal trial as in a jury criminal

trial.  In reaching a decision the court has applied the following law:

> The Indictment or formal charge against a defendant is not evidence
> of guilt.

> Indeed, the defendant is presumed by the law to be innocent.
> The law does not require a defendant to prove his or her innocence or to
> produce any evidence at all.  The Government has the burden of proving a
> defendant guilty beyond a reasonable doubt, and if it fails to do so the
> defendant must be acquitted.

> While the Government's burden of proof is a strict or heavy burden, it is not
> necessary that the defendant's guilt be proved beyond all possible doubt.
> It is only required that the Government's proof exclude any "reasonable
> doubt" concerning the defendant's guilt.

> A "reasonable doubt" is a real doubt; it is a doubt based upon reason and
> common sense, after careful and impartial consideration of all the evidence
> in the case.

> Proof beyond a reasonable doubt is proof of such a convincing character
> that you would be willing to rely and act upon it, without hesitation, in the
> most important of your own affairs.

> A fact-finder should consider only the evidence in the case, but is permitted
> to draw such reasonable inferences from the testimony and exhibits as are
> justified in the light of common experience.

> In other words, a fact-finder may make deductions and reach conclusions
> which reason and common sense lead the fact-finder to draw from the facts

which have been established by the testimony and other evidence in the case.

A fact-finder may also consider both direct and circumstantial evidence.

"Direct evidence" is the testimony of one who asserts actual knowledge of a fact, such as an eye witness.

"Circumstantial evidence" is proof of a chain of facts and circumstances that tend to prove, or disprove, an ultimate conclusion.

The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It requires only that a fact-finder weigh all of the evidence, and be convinced of the defendant's guilt beyond a reasonable doubt before he can be convicted.

Although a fact-finder must consider all of the evidence, a fact-finder is not required to accept all of the evidence as true or accurate.

In deciding whether to believe or not believe any witness, the court considered the same questions that it instructs juries to consider:

> Did the person impress the court as one who was telling the truth?

> Did the witness have any particular reason not to tell the truth?

> Did he or she have a personal interest in the outcome of the case?

> Did the witness seem to have a good memory?

> Did the witness have the opportunity and ability to observe accurately the things he or she testified about?

> Did he or she appear to understand the questions clearly and answer them directly?

> Has the witness said or done something in the past that is inconsistent with his or her testimony?

3

Did the witness' testimony differ from the testimony of other witnesses?

An expert witness testified in this case.  When knowledge of a technical subject matter might be helpful to a fact-finder, a person having special training or experience in that technical field is permitted to state an opinion concerning those technical matters.

Merely because an expert witness has expressed an opinion, however, does not mean that the fact-finder must accept that opinion.  The same as with any other witness, the fact-finder must decide whether to accept his opinion and choose to rely upon it.

A defendant has a right not to testify.  If a defendant does testify, however, that testimony should be weighed and considered, and the defendant's credibility determined, in the same way as that of any other witness.

- - - - - -

The Superseding Indictment charged the defendant with one offense.  It reads as follows:

Count One: [18 U.S.C. §§ 513(a) and 2]

The Grand Jury charges that:

On or about the 25th day of August, 2003, in Jefferson County, within the Northern District of Alabama, the defendant,

*Daniel Lafitte Dumonde,*
*also known as Paul Moore,*
*also known as Danny*
*also known as Daniel Pruitt Spencer,*

while being aided and abetted by another person whose identity is known to the Grand Jury, with the intent to deceive Bobbie Jackson, did knowingly make, possess, utter, and did knowingly cause to be made, possessed, and uttered, a counterfeited security, that is, an official check in the amount of $16,500, drawn on Regions Bank, Birmingham, Alabama, an organization which operates in and affects interstate commerce, in violation of Title 18, United States Code, Sections 513(a) and 2.

**4**

In order for the defendant to be found guilty, the government had the burden of proving the following three elements beyond a reasonable doubt:

1.     That defendant made, uttered, or possessed a counterfeited[1] security[2] of an organization,[3] which operates in or the activities of which affect interstate commerce;[4]

2.     That the making, uttering or possessing of the counterfeit check was with the intent to deceive another person;

3.     That defendant acted willfully and knowingly.[5]

## FINDINGS OF FACT

Upon consideration of all the evidence in the case, the court is of the opinion that the government proved each of these elements beyond a reasonable doubt. Therefore, the court finds the defendant guilty as charged. This opinion will only touch on what the court views as the most significant evidence, but there is additional evidence pointing to defendant's guilt that will not be discussed in these findings.

---

[1] [T]he term "counterfeited" means a document that purports to be genuine but is not because it has been falsely altered, completed, signed or endorsed . . . 18 U.S.C. § 513(c)(1).

[2] [T]he term "security" means - . . . a . . . check . . . 18 U.S.C. § 513(c)(3)(A).

[3] [T]he term "organization" means a legal entity, other than a government, established or organized for any purpose, and includes a corporation, company, association, . . . or any other association of persons which operates in or the activities of which affect interstate . . . commerce. 18 U.S.C. § 513(c)(4).

[4] Interstate commerce means the flow of commerce or business activities between a state and any point outside of that state.

[5] The word "willfully" means that the act was committed voluntarily and purposely, with the specific intent to do something the law forbids; that is, with bad purpose either to disobey or disregard the law. The word "knowingly" means that the act was done voluntarily and intentionally and not because of mistake or accident.

Wade Walker was indicted in the original Indictment along with the defendant and pled guilty several weeks before trial.  Walker testified that he and the defendant agreed to defraud and deceive Bobbie Jackson who offered her ring for sale in the newspaper. Walker testified that defendant talked to Ms. Walker and set up the scenario for the fraud. According to Walker, defendant told Ms. Jackson that his name was Paul Moore and that he was interested in buying the ring for his son's fiancee.  Walker testified that he went to Ms. Jackson's home, posing as Paul Moore's son James, to look at the ring.

Walker identified government Ex. 6 ("GX 6") as the check writing machine on which the defendant made the counterfeit check.  He testified that defendant gave him the counterfeit check (GX 1) to take to Ms. Jackson.  On the two occasions Walker went to Ms. Jackson's home, the defendant drove with him.  Walker dropped the defendant off at a McDonalds and went to Ms. Jackson's alone.  On the second visit Walker gave Ms. Jackson the counterfeit check in the amount of $16,500.00 and Ms. Jackson gave him her diamond ring along with appraisals showing the ring's value to be approximately $25,050.00.  (*See* GX 3.)  Walker stated defendant gave him $500.00 for his assistance in defrauding Ms. Jackson.

Walker testified that he was not completely truthful in his initial interviews with law enforcement .  Specifically, he had denied having any knowledge that the check was counterfeit.[6/]  Having heard the testimony of Walker, the court found him completely

---

[6/]Defendant wants the court to believe that because Walker testified he was scared of law enforcement and lied initially, he was untruthful during the trial.  It is not uncommon for people who have committed crimes to not tell the truth initially.  Not only did the court judge the testimony of
(continued...)

credible and credits his trial testimony as being the truth.  Morever, the court is of the opinion that defendant was the mastermind of the crime charged in this case.

Walker's testimony was corroborated by a great deal of other testimony.  Ms. Jackson testified that she was called about her advertisement by a man who gave his name as "Paul Moore."  Moore told Ms. Jackson that he was interested in her ring for his son's fiancee.  She identified Wade Walker as the person who came to her house posing as the son of Paul Moore.  According to both Ms. Jackson and Walker, Walker came back a second time to "purchase" the ring.  On the second visit he gave Ms. Jackson the counterfeit check in exchange for her ring.  Ms. Jackson testified that she had several conversations with "Paul Moore."  On cross examination by defendant, Ms. Jackson testified that the defendant's voice sounded like the voice of "Paul Moore."

Additional and compelling evidence was developed through investigation of Ms. Jackson's cellular telephone records.  The court was impressed with the diligent detective work that led to the apprehension of defendant and Walker.  Ms. Jackson had provided the detectives the records of her cell phone bill and identified for them the calls from "Paul Moore."  The phone calls from "Paul Moore" were made from pay phones at various businesses or using an AT&T calling card.

---

[6]/(...continued)
Walker concerning defendant's involvement in the crime charged to be truthful, but an enormous amount of circumstantial evidence corroborated Walker's trial testimony and pointed to defendant's guilt.

The evidence at trial reflected that on August 25, 2003, Ms. Jackson was called at 6:35 p.m. by "Paul Moore" using an AT&T calling card.  The call originated from the phone number of the defendant's residence, #205-481-1918.

On August 25, 2003, two calls from "Paul Moore" to Ms. Jackson were made using an AT&T calling card.  Testimony at trial revealed those calls originated from a pay phone, telephone number 205-424-9464, at a Food World store in Bessemer, Alabama.

Matt Stamp, an employee of Bruno's (which operates Food World stores) testified that his employer routinely videotapes certain areas of its stores.  He testified he had been contacted by Officer V.W. Tice of the Jefferson County Sheriff's Department, who asked him for videos of the Food World store in Bessemer, Alabama for the hours of 12:00 noon to 1:00 p.m. and 3:00 p.m. to 5:00 p.m. on August 25, 2003.  These videos were introduced in evidence and played during the trial.  The videos clearly show defendant entering the store and heading in the direction of the pay phone.  He was only in the store a short period of time, but the time period he was in the store included the time that records of Ms. Jackson's cell phone indicated a phone call from "Paul Moore" that had originated from the Food World store in Bessemer, Alabama.  The videos also showed that defendant left the store with no purchases.

Records of the AT&T phone card used to call Ms. Jackson also revealed a phone call to a jewelry store in Smyrna, Tennessee.  The call to the jewelry store was made two days after Ms. Jackson "sold" her ring to Walker.  Officers visited the store and showed a picture of Ms. Jackson's ring to Robert Buck, the owner of Buck's Jewelry.  Mr. Buck

testified that he told the officers he had recently purchased the ring from a person who identified himself to Mr. Buck as "Daniel Spencer."  Mr. Buck gave Ms. Jackson's ring to the officers.  Mr. Buck identified the defendant from a photo lineup as the person who had sold him the ring.  During the trial Mr. Buck identified the defendant as the person who sold him Ms. Jackson's ring using the name "Daniel Spencer."

The government proved beyond a reasonable doubt that the Regions Bank check was counterfeited.  Bruce Weatherford, an employee of Regions Bank, testified and identified Government's Exhibit 1 as a counterfeit check.  The government also proved beyond a reasonable doubt that the counterfeit check presented to Ms. Jackson was of an organization (Regions Bank) whose activities affect interstate commerce.  Mr. Weatherford testified concerning the geographical area in which Regions operates (*see* GX 54) and testified that the business of Regions Bank affects interstate commerce.

After gathering the above-described evidence, law enforcement officers obtained an arrest warrant for the defendant on October 23, 2003.  In addition, a search warrant was issued.  The government offered evidence at trial of items recovered during the execution of the search of defendant's home and automobile.  Some of the items found during the search that have relevance to the case include a checkbook, which contained the same Regions logo found on the counterfeit check, identification cards for Daniel

Spencer,[7] the name used by defendant when he sold Ms. Jackson's ring to Mr. Buck, rub-off letters,[8] and the appraisal of Ms. Jackson's ring.

Frances Watts, a friend of the defendant, testified that, after the defendant was arrested, he called her to come see him at the jail.  When she visited him he gave her his car and house keys.  Sometime after she took possession of defendant's car, she saw a machine in the trunk of his car under a sheet.  Ms. Watts called Sgt. Tice of the Jefferson County Sheriff's Department, and he came and picked it up.  Wade Walker identified this machine (GX 6) as the machine on which he saw defendant make the counterfeit check.

Steve Drexler, a forensic scientist with the Alabama Department of Forensic Science and Questioned Documents and Handwriting Unit, testified for the government. Mr. Drexler examined GX 6, a Hedman Company check writing machine.  He also examined GX 1, the counterfeit check.  Mr. Drexler detailed the reasons for his expert opinion that the check was counterfeit.  Mr. Drexler also opined that the Hedman check writing machine, found by Ms. Jackson in the trunk of defendant's car, made the embossed part of the counterfeit check given to Ms. Jackson.

Defendant made much of the fact that the check writing machine was not in his car when police searched his car, and that since he had been in jail since before the search he could not have put the machine in his car.  Given the overwhelming evidence of defendant's guilt, the court finds this point insignificant.  Lt. Paul Logan testified that

---

[7]These identification cards included a social security card and birth certificate.

[8]The government's expert identified the rub-off letters as being used on the counterfeit check.

after the search of defendant's residence, he learned of a crawl space that the police had not searched. The court does not know who put the machine in defendant's car; it was not the defendant. The court is of the opinion that defendant asked a friend to retrieve the machine from wherever it was and put it in his car. Because the car had already been searched, defendant would have believed the car to be a safe place to hide the machine. Based on argument to the court, defendant apparently feels that the fact the machine was put in his car while he was in jail exonerates him. Contrary to defendant's arguments, the court believes the fact that the machine was found in his car is another piece of evidence pointing to defendant's guilt.

Defendant testified in his own defense. He denied manufacturing the $16,500.00 counterfeit check, denied knowledge that Walker gave the counterfeit check to Bobbie Jackson in exchange for her ring, and denied making phone calls to Ms. Jackson posing as a person named "Paul Moore." According to defendant, Walker brought defendant the ring and asked defendant to sell it for him. Defendant testified he gave Wade Walker the money he received from selling the ring to Buck minus $1,000.00. The court finds all of these statements by defendant to be false.

Defendant took an oath to tell the truth. He did not. His denial of involvement in the scheme to defraud Ms. Jackson was not believed by the court. He violated his oath to tell the truth when he testified falsely that he "came to tell the truth, that [he] can't do anything else."

Defendant admitted on cross examination that he had been convicted of prior felonies.  These earlier crimes, to which he pled guilty, involved scams similar to the one perpetrated against Ms. Jackson.  Defendant admitted buying jewelry with counterfeit checks from victims he located from advertisements placed in the *Birmingham News*.

The court has not commented on all the evidence pointing to defendant's guilt.  As fact-finder the court has no difficulty in reaching a decision consistent with the evidence. The court finds that the government proved beyond a reasonable doubt that defendant is guilty of the crime charged in the indictment.

**DONE** this  day of December, 2004.

_Sharon Lovelace Blackburn_
SHARON  LOVELACE  BLACKBURN
UNITED STATES DISTRICT JUDGE